# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2261 | **DATE** | 6/16/2004 |
| **CASE TITLE** | | Boy Y vs. Chicago Archdiocese, et. al. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated in the attached memorandum opinion and order, plaintiffs' motion for summary judgment is denied. The Archdiocese and Cardinal George's motion for summary judgment is granted. The SCC, Phelan, Lenzen and Mehalek's motion for summary judgment as to plaintiffs' intentional infliction of emotional distress claim and as to plaintiffs' fraud claim against Phelan, Lenzen and Mehalek is granted, and is denied as to plaintiffs' remaining claims. Enter Memorandum Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| X | No notices required, advised in open court. | | | **Document Number** | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | JUN 17 2004 | | |
| | Notified counsel by telephone. | | date docketed | | **109** |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| MF | courtroom deputy's initials | | date mailed notice | | |
| | | | mailing deputy initials | | |

U.S. DISTRICT COURT
CLERK
2004 JUN 16 AM 4:11

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CONSUELA SMITH, a mother and next friend of )
"BOY Y," a minor; AUDREY HAYES, )
a mother and next friend of "BOY W" and "BOY X," )
minors; FRANK and DEBRA GRIGGS, mother and )
next friend of "BOY Z," individually and on behalf )
of the parents and next friend of the SAINTS OF )
SAINT SABINA BASKETBALL PLAYERS, )
)
      Plaintiffs, )
)
      v. )
)
THE CHICAGO ARCHDIOCESE (d.b.a. The )
CATHOLIC BISHOP OF CHICAGO); CARDINAL )
FRANCIS GEORGE; THE SOUTHSIDE CATHOLIC )
CONFERENCE, a non-profit organization; )
MICHAEL PHELAN, Southside Catholic Conference )
Chairman; MIKE MEHALEK, Southside Catholic )
Conference Commissioner; and HOWARD LENZEN, )
Southside Catholic Conference Chairman, )
)
      Defendants. )

DOCKETED

JUN 1 7 2004

No. 02 C 2261

Judge John W. Darrah

## MEMORANDUM OPINION AND ORDER

Plaintiffs filed a five-count fourth-amended complaint against Defendants, alleging

negligence by all Defendants (Count I); breach of contract by all Defendants (Count II);

violation of 42 U.S.C. § 1981 by all Defendants (Count III); fraud against the Southside Catholic

Conference ("SCC"), Michael Phelan, Mike Mehalek, and Howard Lenzen (Count IV); and

intentional infliction of emotional distress against the SCC, Phelan, Mehalek, and Lenzen

(Count V). Presently before the Court is Plaintiffs' Motion for Summary Judgment, the Chicago

Archdiocese and Cardinal George's Motion for Summary Judgment, and the SCC, Phelan,

Lenzen, and Mehalek's Motion for Summary Judgment.

## BACKGROUND

The Catholic Bishop of Chicago, a sole corporation, is the legal name for the Archdiocese of Chicago. The Archdiocese encompasses Cook and Lake Counties in Illinois. (Def.'s 56.1(a)(3) Statement ¶ A1).[1] Howard Lenzen was Chairman and Executive Director of the SCC for one year. His term as Chairman ended on August 16, 2001. Lenzen served on the Executive Committee as Chairman from August 1999 until August 16, 2001. (Id., ¶ A2). Michael Phelan succeeded Lenzen as Chairman of the SCC. Phelan served as Chairman throughout the 2001-2002 season. (Id., ¶ A3). Mike Mehalek was the Boys' Basketball Commissioner for the SCC during the 2001-2002 season. (Id., ¶ A4). Mehalek did not serve on either the Executive Committee or the SCC Board at any time in 2001 and 2002. (Def.'s 56.1(a)(3) Statement ¶ B14). The SCC was formerly known as the Southwest Catholic Conference. (Def.'s 56.1(a)(3) Statement ¶ A5). The SCC was reorganized as an Illinois non-profit corporation in 1998. (Id., ¶ A6). Cardinal Francis George is the Archbishop of Chicago. (Def.'s 56.1(a)(3) Statement ¶ B2).

During the 2001-2002 season, athletic teams from twenty-two parish schools were members of the SCC. (Def.'s 56.1 (a)(3) Statement ¶ A8). Of the twenty-two member parishes, eighteen participated in seventh grade boys' basketball. (Id., ¶ A9). Nineteen of the twenty-two member parishes participated in eighth grade boys' basketball. (Id., ¶ A10).

The SCC is operated by its Board of Directors and its Executive Committee. (Def.'s 546.1(a)(3) Statement ¶ A11). The Board consists of one member from each member school.

---

[1]The Archdiocese and Cardinal George's Statements of Uncontested Facts are designated by the prefix "A"; the remaining Defendants' Uncontested Statements of Facts are designated by the prefix "B".

(Id., ¶A12). The Board has final authority on all SCC matters and votes on all major issues, including membership applications and terminations. (Id., ¶A13). The Executive Committee consists of a chairman, a vice chairman, a recording secretary, a treasurer, and an executive director. (Id., ¶ A14). The Executive Committee members do not vote on major issues and do not vote on membership applications and terminations. (Id., ¶ A15). The Executive Committee is responsible for organizing Board meetings and managing the SCC's finances. (Id., ¶ A16). Patricia Contey served as Executive Director of the SCC during the 2001-2002 season. (Def.'s 56.1(a)(3) Statement ¶ B12).

Plaintiffs are African-Americans that attended St. Sabina Academy during the 2001-2002 school year. (Def.'s 56.1(a)(3) Statement ¶ A17). St. Sabina Academy is located in the Auburn-Gresham neighborhood in Chicago. (Id., ¶ A18). Plaintiffs were members of St. Sabina's seventh and eighth grade basketball teams. (Id., ¶ A19).

In April 2001, Christopher Mallette, the Athletic Director of St. Sabina, contacted the SCC and inquired about the possibility of St. Sabina participating in SCC sports. (Def.'s 56.1(a)(3) Statement ¶ A22). Lenzen visited St. Sabina to meet with Mallette, tour the facilities, and evaluate St. Sabina's sports and academic programs. (Id., ¶ A24). Lenzen found St. Sabina's program "very impressive" and "very organized." Following the visit, Lenzen began recruiting St. Sabina as a potential member of the SCC. (Id., ¶ A25). In April 2001, Lenzen, in a written communication, informed the Board that he found St. Sabina qualified to become a member and recommended that the Board consider St. Sabina's application to become a full member of the SCC. (Id., ¶A26). Lenzen saw the opportunity to begin a "process of coming together with an African-American parish that is strong and viable." (Id., ¶ A27).

3

Lenzen concluded that "there is no other answer than to have St. Sabina become a full member of the SCC." (Id., ¶ A28). Following Lenzen's letter, the SCC invited St. Sabina to attend a Board meeting and discuss their application. (Id., ¶ A29). Mallette attended the May 17, 2001 meeting and made a presentation on behalf of St. Sabina. (Id., ¶ A30).

On May 25, 2001, the full Board met and considered St. Sabina's membership application. (Def.'s 56.1(a)(3) Statement ¶ A31). During the meeting, a police officer from Christ the King spoke about crime in the area surrounding St. Sabina. (Id., ¶ A32). The police officer discussed crime statistics for the Sixth District of the Chicago Police, which includes St. Sabina. (Id., ¶ A33). The Board did not voice concerns about St. Sabina itself, or the racial composition of its parish, but did discuss the area in which the school is located. (Id., ¶ A34). Board members voiced concerns about crime statistics, the safety of the area around St. Sabina, and the safety of travel into the Auburn-Gresham neighborhood. (Id., ¶ A35). The Board voted to deny St. Sabina's application by a vote of 11- 9, citing safety concerns as the reason for the denial. (Def.'s 56.1(a)(3) Statement ¶ B20).

The entire Board was present for the vote on St. Sabina's application. (Def.'s 56.1(a)(3) Statement ¶A 38). The vote was the first time the Board voted on a new membership since it had incorporated in 1998. (Id., ¶ A36). At that time, the Board had no established protocol for calling for a vote and whether the votes would be made in the open or by ballot. (Id., ¶ A37). Lenzen presided over the meeting but did not vote because he did not have voting power under the SCC bylaws. (Id., ¶ A39). Phelan was not a member of the Board and had no voting power. (Id., ¶ A 40). Mehalek was not a member of the Board and did not attend or vote at the May 25, 2002 meeting. (Id., ¶ A41).

Lenzen was stunned and disappointed with the result and reserved the right to come back to the Board for another vote after he contacted Mallette to address some of the Board members' concerns with regard to safety. (Def.'s 56.1(a)(3) Statement ¶¶ A44-45). Following the vote, Lenzen telephoned Mallette to inform him of the decision by the Board and that he would not give up on the matter. (Def.'s 56.1(a)(3) Statement ¶ B21).

After the May 25, 2001 Board meeting and vote, St. Sabina's pastor, Michael Pfleger, wrote twenty-one other pastors a letter in which he stated that he believed the denial of St. Sabina's membership was based on racism. (Def.'s 56.1(a)(3) Statement ¶ A48). Father Pfleger believed that racism was involved in the decision, and he wanted to "bring out" the reasons he believed St. Sabina was rejected by the Board. (Id., ¶ A49). Anita Baird, the Director of the Archdiocese's Office of Racial Justice, also expressed her belief that the decision to deny membership was based on racism. (Id., ¶ A50).

Several days later, Cardinal George returned from Rome to find that the denial of St. Sabina's membership application had become a major news story in Chicago. (Def.'s 56.1(a)(3) Statement ¶ A52). Cardinal George believed that safety was a legitimate concern but also realized the importance of allowing children of different backgrounds to get to know one another through sports. (Id., ¶ A54). Cardinal George encouraged parish pastors and coaches to admit St. Sabina to the SCC and attempted to foster a rapport between St. Sabina and the SCC. (Id., ¶¶ A55-56). On May 31, 2001, the leadership of the Archdiocese issued a statement rejecting the SCC's reported safety concerns as a justifiable reason not to accept St. Sabina into

5

the SCC. (Def.'s 56.1(a)(3) Statement ¶ B23). In addition, St. Sabina proposed to supply buses for SCC teams competing against St. Sabina to address the SCC's safety concerns. The SCC rejected this proposal. (Plaint.'s 56.1(a)(3) Statement ¶ 63).

Cardinal George also told pastors and coaches to reconsider St. Sabina's request to be admitted into the SCC and to find a way to admit St. Sabina. (Plaint.'s 56.1(a)(3) Statement ¶ 70). He also influenced the SCC to consider St. Sabina's request for certain rules to be in place upon its admission into the SCC. (Id., ¶ 73). Cardinal George promised Father Pfleger that he would talk to individual parish pastors about the SCC and accepting St. Sabina into the SCC. (Id., ¶ 74).

On June 20, 2001, Cardinal George stated in an article published in *The Catholic New World*, the Archdiocesan newspaper, that "Concern for safety and fear of violence are legitimate fears; but the words are, as we all know, often code words to mask racism." (Def.'s 56.1(a)(3) Statement ¶ B24). That same day, Lenzen called the Board to vote again on St. Sabina's membership. (Def.'s 56.1(a)(3) Statement ¶ A60). Both prior to and following the May 2001 vote, Lenzen had proposed to Mallette that St. Sabina agree to play all of its games on the road for its first three years in the SCC; but Mallette flatly refused that suggestion. (Def.'s 56.1(a)(3) Statement ¶B22). The Board approved St. Sabina's membership application without conditions. (Def.'s 56.1(a)(3) Statement ¶ A67). Lenzen announced the Board's decision in a press release dated June 20, 2001. (Id., ¶ A68). The only other SCC parishes that applied for admission into the SCC were Cardinal Bernardine and St. Alexander, predominantly white catholic parishes. These two parishes were admitted in the Spring 2003 without initial denials and without restrictions. (Plaint.'s 56.1(a)(3) Statement ¶ 44).

6

In July 2001, St. Sabina withdrew from the SCC. (Def.'s 56.1(a)(3) Statement ¶ B34). Cardinal George informed St. Sabina that it could not withdraw from the SCC and that other parishes that were members of the SCC could not forfeit games against St. Sabina. (Id., ¶ B35). However, St. Sabina refused to accept membership until the SCC met three non-negotiable demands, including: (1) the SCC adopt a rule prohibiting forfeitures, (2) equal safety measures at all games, and (3) a policy addressing inappropriate behavior. (Def.'s 56.1(a)(3) Statement ¶¶ A69-70). The demands were transmitted to the SCC in a July 13, 2001 letter from St. Sabina to the SCC. (Id., ¶ A71). According to SCC bylaws, the bylaws and sports rules may only be amended once annually in March. (Id., ¶ A72). Nevertheless, Lenzen called a special meeting of the Board on August 9, 2001. (Id., ¶ A73). The Board approved a rule prohibiting teams from forfeiting, a rule that set minimal health and safety standards, and a policy to deal with inappropriate behavior. (Id., ¶ A74). St. Sabina attended and participated in the August 9, 2001 Board meeting. (Id., ¶ A75).

On July 12, 2001, the Office of Racial Justice of the Archdiocese of Chicago sent a letter to Mallette in which Bishop Goedert, vicar general of the Archdiocese, asked the pastors of the SCC parishes to take the lead in designing a process that will call for an open and honest dialogue about the sin of racism. (Plaint.'s 56.1(a)(3) Statement ¶ 80). On July 16, 2001, Cardinal George sent a letter to the pastors in the SCC instructing them to check with him as "pastor of the Archdiocese of Chicago" before making or announcing to the press any decision to withdraw from a game with St. Sabina. (Id., ¶ 82). On August 5, 2001, Cardinal George stated that no one could act unilaterally as to the SCC/St. Sabina controversy without consultation with him and other parishes. (Id., ¶ 85).

Prior to the basketball season beginning, members of some parishes continued to publicly state that they would not travel to St. Sabina for basketball games. (Def.'s 56.1(a)(3) Statement ¶ A76). In July, Father Dowling suggested that the SCC schedule teams to play at St. Sabina that were willing to travel to St. Sabina. (Id., ¶ A77). Lenzen forwarded the suggestion to Phelan. (Id., ¶ A78). Lenzen acknowledged problems inherent in arranging the schedule and the possible problems that may arise as a result of scheduling teams at St. Sabina that were willing to play at St. Sabina. (Id., ¶ A79). Lenzen's advice, however, was not to just schedule teams that were willing to go to St. Sabina but to just schedule games the way the SCC ordinarily would and "let the chips fall where they may." (Id., ¶ A80). According to Lenzen, "the integrity of the SCC is clear, and it will be up to each parish to face the music." (Id., ¶ A81).

During the 2001-2202 season, eighteen teams participated in seventh grade boys' basketball, and nineteen teams participated in eighth grade boys' basketball. ( (Def.'s 56.1(a)(3) Statement ¶¶ A107-108).

Unlike St. Sabina, not all SCC member teams' schools have basketball courts located on the premises. (Def.'s 56.1(a)(3) Statement ¶ A104). The SCC classifies games as either "home," "away," or "neutral-site" games. The term "neutral-site" games refers to games hosted by teams whose schools do not have a gym or an appropriate facility to host SCC basketball games. These schools "host" what would otherwise be their "home" games at other available neighborhood facilities. (Id., ¶ A105). Neutral-site games can also refer to games that are hosted by teams whose schools do have a gym, but whose gym is being utilized for other purposes on the date the team is scheduled to host a game. In such instances, the team "hosts"

the game at another neighborhood facility, and the game is characterized as a neutral-site game. (Id., ¶A106).

Of the teams that participated in seventh or eighth grade basketball, only fourteen of them had basketball courts at their schools. (Def.'s 56.1(a)(3) Statement ¶ A109). The remaining six teams did not have adequate facilities or basketball courts at their respective schools. (Id., ¶ A110). These six teams host games at other parish gyms, local grammar and high schools, and local Chicago parks. (Id., ¶ A111). Annunciata hosts all of its games at Rowan Park, a facility of the Chicago Park District. (Id., ¶ A112). St. Albert hosts games at St. Laurence High School and other parish gyms. (Id., ¶ A113). St. Christina hosts games at Mount Greenwood, a facility of the Chicago Park District. (Id., ¶ A114). St. Denis hosts games at Scottsdale Park, a facility of the Chicago Park District. (Id., ¶ A115). St. Gerald hosts games at Covington School and other parish gyms. (Id., ¶ A116). St. Louis hosts games at Simmons Junior High School. (Id., ¶ A117).

The majority of parish gyms do not have locker room facilities. (Def.'s 56.1(a)(3) Statement ¶ A126). St. Barnabas, St. Germaine, and St. Bede do not have locker room facilities to offer either home or away teams. (Id., ¶¶ A120-122). St. Sabina players changed in hallways and in a kitchen at schools that did not have locker rooms. (Plaint.'s 56.1(a)(3) Statement ¶¶ 136-140).

Mehalek, a SCC commissioner, was responsible for scheduling all boys' basketball games. (Def.'s 56.1(a)(3) Statement ¶ A83). Mehalek originally scheduled St. Sabina's seventh grade team to play nine home games, four away games, and two neutral-site games. (Id., ¶ A87). The schedule changed after Eileen O'Connell, the SCC's volleyball commissioner, informed

9

Mehalek that she needed some of the dates that St. Sabina had allotted for SCC so that St. Sabina's girls' volleyball team could host some home games. (Id., ¶ A88). As a result, Mehalek rescheduled two of St. Sabina's seventh grade home games to other locations -- St. Sabina's seventh grade game against St. Catherine to Marist High School and St. Sabina's game against St. Linus to St. Rita High School. (Id., ¶¶ A89-91). Mehalek also rescheduled St. Sabina's seventh grade game against St. Mary to St. Mary when St. Sabina requested the change because St. Sabina needed the gym for another event. (Id., ¶ A92).

The seventh grade teams of St. Alexander, St. Christina, St. Michael, Holy Redeemer, St. Albert, St. Cajetan, St. John, St. Linus, Annunciata, St. Catherine, St. Mary, Queen of Martyr's, Christ the King, and St. Denis had the same number of or fewer home games than St. Sabina's seventh grade team. (Def.'d 56.1(a)(3) Statement ¶ A94). The seventh grade teams at St. Alexander and St. Linus had the same number of neutral-site games as St. Sabina's seventh grade teams. (Id., ¶ A95).

Mehalek originally scheduled St. Sabina's eighth grade team to play eight home games, four away games, and three neutral-site games. (Def.'s 56.1(a)(3) Statement ¶ A96). To accommodate St. Sabina's volleyball team, Mehalek rescheduled three of St. Sabina's eighth grade home games to other locations. (Id., ¶ A97). St. Sabina's eighth grade game against St. Louis was rescheduled to Marist High School; the game against St. Linus was rescheduled to St. Rita High School, and the game against St. Gerald was rescheduled to St. Barnabas. (Id., ¶¶ A98-100). Accordingly, St. Sabina's eighth grade schedule, with adjustments, included five home games, seven away games, and three games at neutral sites. (Def.'s 56.1(a)(3) Statement ¶ B44).

The eighth grade teams of St. Catherine, St. Michael, Holy Redeemer, St. John, St. Linus, and St. Alexander each had the same number of or fewer home games than St. Sabina's eighth grade team. (Def.'s 56.1(a)(3) Statement ¶ A101). The eighth grade teams of St. Alexander, St. Christina, St. Gerald, Holy Redeemer, St. Albert, St. Louis, St. Michael, Annunciata, St. Cajetan, St. John, St. Linus, Queen of Martyrs, St. Catherine, St. Mary, and St. Denis each had the same number of or more away games than St. Sabina's eighth grade team. (Id., ¶ A102). The eighth grade team of St. Linus had the same number of neutral-site games as St. Sabina's eighth grade team. (Id., ¶ A103).

Mehalek scheduled games based upon gym time and availability. (Def.'s 56.1(a)(3) Statement ¶ A118). Mehalek's method of scheduling had nothing to do with race. (Id., ¶ A119).

During the regular season, the SCC permitted seventh graders to "play up," which meant that these players could play on their school's seventh and eighth grade teams, for a total of four quarters a day. (Def.'s 56.1(a)(3) Statement ¶ B39). St. Sabina had two seventh grade students, neither of whom are plaintiffs in this case, who regularly played up pursuant to this rule. (Id., ¶ B40). The SCC had an unwritten rule that never allowed teams to use one player on both the seventh and eighth grade teams during the playoffs. (Def.'s 56.1(a)(3) Statement ¶ A127). This rule has been in effect for at least twelve years. (Id., ¶ A128). Mallette had understood from the beginning of the regular season that seventh grade players could play up during both the regular season and the playoffs. (Def.'s 56.1(a)(3) Statement ¶ B72). Mehalek and Phelan also thought this and so advised Mallette when he questioned them about the unwritten rule. (Id., ¶ B73). Contey informed Mallette, Mehalek, and Phelan of the unwritten rule for the playoffs and informed them that it had been applied in prior playoffs in other SCC sports. (Id., ¶ 74). During

11

the 2001-2002 season, this rule adversely affected St. Sabina, Annunciata, St. Denis, and St. Mary, all of whom had players that played on both the seventh and eighth grade teams during the regular season. (Def.'s 56.1(a)(3) Statement ¶ A130).

At the basketball games, seats are not assigned. (Def.'s 56.1(a)(3) Statement ¶ A131). Seating is a matter of "first come, first serve." (Id., ¶ A132). Father Pfleger attended every St. Sabina game and never witnessed Plaintiffs or their parents being forced to sit in racially segregated areas. (Id., ¶¶ 135-136).

During the summer of 2001, Mallette refused to shake hands of the St. Linus coach at an event involving the efforts to reach agreement regarding St. Sabina's participation in the SCC and the conditions that St. Sabina insisted upon. (Def.'s 56.1(a)(3) Statement ¶ B90). On January 10, 2002, the St. Linus coach refused to shake Mallette's hand at the game between St. Linus and St. Sabina. (Id., ¶ B91).

At the January 20, 2002 game between St. Sabina and St. Bede, a St. Bede player said to Boy Y, a St. Sabina player, "Go home, nigger." (Def.'s 56.1(a)(3) Statement ¶ A139). St. Sabina filed a complaint with the SCC about the racial slur and St. Sabina's belief that the St. Bede teams played in an unduly rough and unfair manner and that the officiating was poor and favored St. Bede. St. Bede filed a complaint alleging that St. Sabina's coaches and parents displayed a lack of sportsmanship. (Def.'s 56.1(a)(3) Statement ¶¶ B49-50). The Executive Committee investigated St. Sabina's complaint regarding the incidents and conducted a hearing about the racial slur. (Id., ¶ B54). On February 21, 2002, the Executive Committee issued its decision, determining that Boy Y had been called a racial slur by one of St. Bede's players. The Executive Committee concluded that a member of each school's eighth grade boys' basketball

12

team would be required to participate in peer mediation. If St. Sabina refused to participate, the SCC would consider the matter closed. If St. Bede refused to participate, the eighth grade team would not be allowed to participate in the playoffs. (Id., ¶ B56). St. Sabina agreed to participate in the peer mediation. (Id., ¶ B57). St. Bede did not agree to the peer mediation. (Id., ¶ B58).

After receiving word that St. Bede had not agreed to peer mediation, Phelan informed Mallette on March 1, 2002, that St. Bede's eighth grade boys' basketball team would not be in the playoffs. (Def.'s 56.1(a)(3) Statement ¶B59). At the urging of St. Bede parents and St. Bede's pastor, the Executive Committee held a meeting on March 5, 2002, to reconsider its decision. (Id., ¶ A 143). Upon reconsideration, the Executive Committee determined that the previously selected punishment was too severe in that it punished all St. Bede players for the misconduct of one. The Executive Committee reversed its decision and allowed St. Bede to participate in the playoffs. (Id., ¶ A144). St. Sabina became aware of the decision to allow St. Bede into the playoffs at the playoff seating party held on March 6, 2002. (Id., ¶ A145). The SCC announced its decision to permit St. Bede to participate in the playoffs in a letter dated March 15, 2002. (Id., ¶A 146).

On March 7, 2002, Mallette and Father Pfleger called a meeting of the parents of the students participating in St. Sabina's teams to discuss the issues. The players themselves did not participate in the meeting. (Def.'s 56.1(a)(3) Statement ¶ B77). Following a discussion of the issues, the parents voted to withdraw from the SCC. (Id., ¶ B78). Mallette informed the SCC of the parents' decision to withdraw from all SCC activities and events, including the playoffs, by a letter dated March 7, 2002. On March 8, 2002, Mallette faxed this letter to Cardinal George. (Id., ¶ B 81).

Mehalek was responsible for recording the scores from every basketball game during the 2001-2002 season. (Def.'s 56.1(a)(3) Statement ¶ A147). If a forfeiture had occurred during the 2001-2002 season, Mehalek would have been notified as Boys' Basketball Commissioner. (Id., ¶ A149). During the 2001-2002 season, no team forfeited a game against St. Sabina. (Id., ¶ A150). The only team to forfeit a game during the 2001-2002 was St. Sabina, which forfeited its playoff game against St. Gerald. (Id., ¶¶ A151-152).

The SCC does not recognize or provide for "home court advantage" during post-season play. (Def.'s 56.1(a)(3) Statement ¶ A 153). The SCC asks local catholic high schools for gym time and schedules for playoff games at the local high schools, if possible. (Id., ¶ A154). The SCC uses high schools for playoff games to expose the players to the atmosphere of high school sports, including the larger crowd and court size. (Id., ¶ A 155). Only if the SCC cannot get enough gym time at high schools to accommodate all playoff games does the SCC schedule playoff games at member schools. (Id., ¶ A158).

The basketball playoffs for the 2001-2002 season began on March 6, 2002. (Def.'s 56.1(a)(3) Statement ¶ A159). The last date that St. Sabina made its gym available for SCC use was March 2, 2002. (Id., ¶ A160). St. Sabina's seventh and eighth grade teams were scheduled to play their first playoff game on March 9, 2002 at Brothers Rice and Marist High Schools, respectively. (Def.'s 56.1(a)(3) Statement ¶ B68). Mallette had been advised earlier in the season that seventh and eighth grade playoffs are generally scheduled simultaneously and at

14

different locations; Mallette had asked Mehalek to try to schedule the playoff games for St. Sabina's teams for consecutive times at the same location. (Id., ¶B 69). The playoff schedule showed that St. Sabina's seventh and eighth grade teams, like most of the other teams in the league, would be playing their playoff games simultaneously at different sites. St. Sabina objected to this rule. (Id., ¶ B70).

During the St. Sabina/SCC controversy, Cardinal George met with Phelan, Lenzen, and Mallette several times regarding the controversy and communicated with them by telephone on a regular basis. (Plaint.'s 56.1(a)(3) Statement ¶ 20). Cardinal George exercises managerial control over parish priests and intervenes in matters where parish priests fail to conform to the faith, unity of worship, unity of mission or the cannons of the church. (Id., ¶ 66).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

A party opposing a motion for summary judgment must file a concise response to the

movant's statements of material fact including a response to each numbered statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon by the opposing party. The opposing party may also include statements of additional material facts that rebut the moving party's motion. These additional facts must also include references to affidavits, parts of the record, and other supporting materials that support such additional material facts. L.R. 56.1(b)(3).

### Section 1981 Claim

The Defendants argue that Plaintiffs' Section 1981 claim fails because the Plaintiffs were not deprived of their rights under the SCC/St. Sabina contract.

To establish a claim under Section 1981, a plaintiff must show that: (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination deprived the plaintiff of one or more of the rights enumerated in Section 1981, *i.e.*, the making and enforcement of a contract. *See Morris v. Office Max*, 89 F.3d 411, 413 (7th Cir. 1996). Under Section 1981, "making or enforcing" a contract includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The making and enforcement of a contract right under Section 1981 also includes third-party beneficiaries of a contract. *See Jones v. Local 520, Int'l Union of Operating Eng.*, 603 F.2d 664, 665 (7th Cir. 1979).

To avoid summary judgment on their race discrimination claim, the Plaintiffs must present facts from which a reasonable juror could find that the Defendants interfered with their

contractual rights because of their race. *See Steinhauer v. Degolier*, 359 F.3d 481, 483 (7th Cir. 2004) (*Steinhauer*). A *prima facie* case under Section 1981 includes evidence that (1) the plaintiffs are members of a racial minority, (2) the defendant had an intent to discriminate on the basis of race, and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). There are two methods of proof available to the Plaintiffs – the indirect method and the direct method. *See Steinhauer*, 359 F.3d at 484.

Under the *McDonnell Douglas* indirect method, the plaintiff must establish a *prima facie* case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. The defendant is entitled to summary judgment at this point unless the plaintiff can present sufficient evidence that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer*, 359 F.3d at 484. For summary judgment purposes, the plaintiff must only produce evidence from which a rational factfinder could infer that the defendant lied about its proffered reasons for its actions. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994).

The parties do not dispute that the Plaintiffs are a member of a racial minority and are third-party beneficiaries of the St. Sabina/SCC contract. In addition, Plaintiffs have identified several actions by the Defendants that were allegedly motivated by the Plaintiffs' race that interfered with their right to make and enforce the contract. These actions include the initial denial of St. Sabina's application in March 2001, the scheduling of games, unequal and unsafe accommodations, the imposition of the unwritten playoff rule, and segregated seating at the games. Material issues of fact exist as to whether these actions were racial motivated.

Defendants argue that Plaintiffs' claim based on the March 2001 denial of St. Sabina into the SCC cannot support their Section 1981 claim because Plaintiffs have failed to demonstrate that the proffered reason for the denial was a pretext for discrimination and because St. Sabina's ultimate admission into the SCC moots the claim.

Defendants' proffered nondiscriminatory reason for denying St. Sabina's membership in the SCC was the safety of the players in light of St. Sabina's neighborhood. However, Plaintiffs have produced sufficient evidence from which a rational factfinder could infer that the Defendants lied about this proffered reason for its actions, including: the leadership of the Archdiocese's issuing a statement rejecting the SCC's reported safety concerns as a justifiable reason to not accept St. Sabina; the SCC's rejection of St. Sabina's proposal to supply buses for SCC teams competing against St. Sabina; and, in light of his involvement in the controversy, Cardinal George's statement that safety and fear of violence were often code words for racism which was made the same day that the SCC re-voted to let St. Sabina join the SCC.

In addition, Defendants' mootness argument is without merit because the Plaintiffs have suffered an injury - the initial denial of their membership application – which could be addressed by a favorable decision in this Court, including compensatory and punitive damages as sought by the Plaintiffs.

The Archdiocese and Cardinal George also argue that Plaintiffs' Section 1981 claim against them fails because they are not subject to liability for the actions of others and no agency relationship existed to impose such liability. Plaintiffs argue that an agency relationship existed between the Archdiocese and Cardinal George and the other Defendants.

"'Agency is the fiduciary relation which results from the manifestation of consent by one

person to another that the other person shall act on his behalf and subject to his control, and consent by the other so to act.'" *General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 392 (1982) (*General Building*), quoting Restatement (Second) of Agency § 1. The power of a party to oppose the actions of another does not establish the "right to control" element. *See General Building*, 458 U.S. at 395.

Plaintiffs contend that the Archdiocese and Cardinal George had an agency relationship with the other Defendants, basing their argument on the actions by the Archdiocese and Cardinal George during the SCC/St. Sabina controversy. However, the actions of the Archdiocese and Cardinal George, while demonstrating concern about the treatment of St. Sabina by the other Defendants, do not support the existence of an agency relationship between the Archdiocese and Cardinal George and the other Defendants. Plaintiffs have failed to provide facts that manifest consent by the other Defendants to act on behalf of either the Archdiocese or Cardinal George and subject to their control. *See General Building*, 458 U.S. at 392.

Plaintiffs also argue that liability attaches to the Archdiocese and Cardinal George through "control person liability." Control person liability is a means to hold one defendant vicariously liable for the securities violations committed by another, *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). Plaintiffs fail to provide any support to find Section 1981 liability based on a theory of control person liability. Accordingly, Section 1981 liability cannot be imposed on the Archdiocese and/or Cardinal George based on control person liability.

Based on the above, the Archdiocese and Cardinal George's Motion for Summary Judgment as to Plaintiffs' Section 1981 claim is granted. The remaining Defendants' and

Plaintiffs' motions for summary judgment as to the Section 1981 claim are denied.

## Negligence Claim

All parties move for summary judgment on Plaintiffs' negligence claim. To survive summary judgment on a negligence claim, the plaintiff must establish that the defendant owed the plaintiff a legal duty and a breach of that duty that proximately caused the plaintiff's injuries. *See Ward v. K Mart Corp.*, 136 Ill. 2d 132, 140 (1990).

As to all Defendants, Plaintiffs allege that all of the Defendants owed Plaintiffs a duty of reasonable care and that they breached that duty. Plaintiffs argue that the Defendants had a duty under Article I of the SCC Bylaws to foster an organized athletic competition between and among Plaintiffs and other SCC members free from racial considerations.

Generally, a duty of ordinary care arises from the performance of a contract. *See Lerner v. Ravenswood Hosp. Med. Cent.*, 1999 WL 1267710 (N.D. Ill. Nov. 10, 1999). Here, the contract consists of the bylaws of the SCC, which include the purpose of the conference to foster organized athletic competition between and among the schools and to help youth "attain a balance between and integration of family, religious, academic and athletic life." Genuine issues of material fact exist as to whether the conduct of those Defendants who were parties to the contract -- Lenzen, Phelan, Mehalek, and the SCC -- constituted a breach of their duty of ordinary care in performing the contract. Accordingly, summary judgment on this claim in favor of these Defendants is denied.

As to the Archdiocese and Cardinal George, they were not part of the SCC/St. Sabina contract and owe no duty to Plaintiffs thereon. Nor have Plaintiffs established the existence of any other contractual relationship among Plaintiffs and the Archdiocese and Cardinal George.

Plaintiffs argue that the Archdiocese and Cardinal George were negligent by multiple acts including: failing to intervene after the Plaintiffs were admitted to the SCC when they knew or should have known that they were being discriminated against, failing to attend any of Plaintiffs' home games, failing to take the lead in developing a process for open dialogue about racism, failing to recognize the gravity of the situation, and improperly delegating managerial control of the SCC to those who were incapable of making decisions free from racial motivation. All of these allegations as to the Archdiocese and Cardinal George constitute an alleged duty to protect the Plaintiffs from harm. However, the Plaintiffs cannot claim negligence for another's failure to protect them unless they and the Defendants have a "special relationship," such as that between common carrier and passenger, innkeeper and guest, business owner and invitee, or voluntary custodian and protectee. *See Geimer v. Chicago Park Dist.*, 272 Ill. App. 3d 629, 632 (1995). Plaintiffs have failed to establish that any of these "special relationships" exist between them and the Defendants. Furthermore, as discussed above, Plaintiffs have failed to establish an agency relationship to impose negligence liability on the Archdiocese or Cardinal George for the other Defendants' conduct.

Based on the above, the Archdiocese and Cardinal George's Motion for Summary Judgment as to Plaintiffs' negligence claim is granted. The Plaintiffs' and remaining Defendants' motions for summary judgment as to Plaintiffs' negligence claim are denied.

### Breach of Contract Claim

All parties move for summary judgment on Plaintiffs' breach of contract claim. Plaintiffs again argue that the Defendants breached the bylaws of the contract by injecting race into the parties' dealings. Genuine issues of material fact exist as to whether the conduct of the

Defendants' who were parties to the contract -- Lenzen, Phelan, Mehalek, and the SCC – constituted a breach of the bylaws. Accordingly, summary judgment on this claim for those parties is denied.

As discussed above, as to the Archdiocese and Cardinal George, Plaintiffs have failed to establish any contract, written or oral, between the Plaintiffs and the Archdiocese or Cardinal George.

Based on the above, the Archdiocese and Cardinal George's Motion for Summary Judgment as to Plaintiffs' breach of contract claim is granted. The Plaintiffs' and the remaining Defendants' motions for summary judgment as to Plaintiffs' breach of contract claim are denied.

<u>Fraud Claim</u>

The SCC, Phelan, Lenzen, and Mehalek and the Plaintiffs move for summary judgment on Plaintiffs' fraud claim. To withstand or be granted summary judgment on their fraud claims, the Plaintiffs must establish: (1) a false misrepresentation of a material fact, (2) by a party who knows or believes it to be false, (3) with the intent to induce the Plaintiffs to act, (4) reliance on the statement by the Plaintiffs, and (5) damages to Plaintiffs.

Plaintiffs allege that these Defendants falsely represented that security would be provided at St. Sabina's games, that St. Bede would not participate in the playoffs, that teams would not forfeit games, and that the SCC would enforce its rules against racial taunting. Plaintiffs also allege that they relied upon these representations in joining the SCC. A material issue of fact exists as to Plaintiffs' allegation that the SCC and St. Sabina agreed that security would be present at St. Sabina games as neither party has demonstrated that security was or was not provided at St. Sabina's games. Furthermore, genuine issues of material fact exist whether this

assurance was material and whether it caused any damages to Plaintiffs. However, Plaintiffs have failed to show that Phelan, Lenzen, or Mehalek made any of the allegedly false statements.

Based on the above, summary judgment is granted on Plaintiffs' fraud claim as to Defendants Phelan, Lenzen, and Mehalek and is denied as to the SCC.

## Intentional Infliction of Emotional Distress

The SCC, Phelan, Lenzen, and Mehalek and the Plaintiffs move for summary judgment on Plaintiffs' intentional infliction of emotional distress claim. To withstand summary judgment on their intentional infliction of emotional distress claim, a plaintiff must establish that, (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended that their conduct would cause severe emotional distress, and (3) the defendant's conduct did in fact cause severe emotional distress. *See Doe v. Calumet City*, 161 Ill. 2d 374, 392 (1994).

Plaintiffs have failed to establish that any of the alleged conduct caused any of the Plaintiffs severe emotional distress. Instead, Plaintiffs improperly rely upon unsubstantiated facts alleged in their Amended Complaint. *See Greer*, 267 F.3d at 729.

Based on the above, the Defendants' Motion for Summary Judgment as to Plaintiffs' intentional infliction of emotion distress claim is granted; and Plaintiffs' Motion for Summary Judgment as to Plaintiffs' intentional infliction of emotional distress is denied.

23

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied. The Archdiocese and Cardinal George's Motion for Summary Judgment is granted. The SCC, Phelan, Lenzen, and Mehalek's Motion for Summary Judgment as to Plaintiffs' intentional infliction of emotional distress claim and as to Plaintiffs' fraud claim against Phelan, Lenzen, and Mehalek is granted, and is denied as to Plaintiffs' remaining claims.

Dated: June 16, 2004

JOHN W. DARRAH
United States District Judge